# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-0616V

|  |  |
|---|---|
| MELINDA MAE ROBINSON, | Chief Special Master Corcoran |
| Petitioner, | Filed: September 23, 2025 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Bridget Candace McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Felicia Langel, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 12, 2021, Melinda Mae Robinson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"), which she amended on September 22, 2022. Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine received on March 11, 2019. Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 46, 47). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $105,000.00.

## I.    Factual Evidence

### A.  Medical Records

On March 11, 2019, Petitioner received a Tdap vaccine, during an emergency department visit for a cut on her thumb. Ex. 1 at 3; Ex. 15 at 191. The vaccination record states that it was administered in Petitioner's left deltoid, although she maintains that it was actually administered in her *right* arm. *Id.*; Ex. 15 at 198.

Two weeks later (March 25, 2019), Petitioner saw Dr. John Doan at Moody Air Force Base, complaining of a two-week history of right shoulder pain. Ex. 5 at 68. She related her pain to a vaccination, stating that her pain "started two days after injection." *Id.* Her pain was "unremitting" and ranged from five to seven out of ten. *Id.* She had full active and passive range of motion ("ROM"), with pain, along with mild strength deficits. *Id.* at 68, 69. Dr. Doan assessed her with an adverse vaccination effect, suspecting that her pain was due to inflammation surrounding the axillary nerve from her recent vaccination. *Id.* at 69. He prescribed oral steroids and ibuprofen. *Id.*

Petitioner saw Dr. Herman Dykes at Moody Air Force Base for right shoulder pain the following month (April 24, 2019). Ex. 5 at 66. The steroid taper had improved her condition by 40%, but she still had sharp pain with right shoulder extension, flexion, and lying on her right side. *Id.* She also reported weakness with abduction. *Id.* On examination, her shoulder exhibited "exquisite" pain on palpation. *Id.* at 67. Her ROM was normal but painful. *Id.* She was assessed with right shoulder pain, with Dr. Dykes stating that "some of the tetanus [vaccine] may have entered the subacromial space" and ordering a second round of oral steroids. *Id.*

Petitioner returned to Dr. Dykes the following week (May 1, 2019). Ex. 5 at 63. The second steroid taper had helped decrease her discomfort, but she still had "significant shoulder discomfort and weakness with usage." *Id.* Dr. Dykes referred Petitioner for an EMG/NCV and MRI. *Id.* at 64. The MRI showed abnormal fluid in the subacromial/subdeltoid bursa as well as impingement and evidence of rotator cuff tears. *Id.* at 178-79. Petitioner saw Dr. Dykes on June 19, 2019 to review the MRI, and he referred her to an orthopedist. *Id.* at 59-60.

The next day (June 20, 2019), Petitioner saw a neurologist, and reported pain and limited ROM in her right shoulder since her March vaccination. Ex. 12 at 4. A nerve

conduction study was normal, with no electrophysiologic evidence of entrapment neuropathy, radiculopathy, myopathy, or plexopathy. *Id.* at 5.

Petitioner saw Dr. Kevin Collins for right shoulder pain the following week (June 26, 2019). Ex. 8 at 26-28. On examination, her right shoulder ROM was 170 degrees in abduction, 170 degrees in forward elevation, and 80 degrees in external rotation. *Id.* She exhibited positive results on the Hawkins and O'Brien's tests. *Id.* She was assessed with a right shoulder partial rotator cuff tear and given a cortisone injection and PT referral. *Id.* at 28-29.

Petitioner underwent a PT evaluation for right shoulder pain on July 9, 2019. Ex. 8 at 172. She reported that her pain began after a vaccination, and that she now had decreased shoulder mobility and pain. *Id.* During the evaluation, she rated her pain as two out of ten, ranging to five out of ten at worst. *Id.* On examination, her right shoulder active ROM was 134 degrees in flexion, 102 degrees in abduction, 62 degrees in external rotation, and 70 degrees in internal rotation. Her right shoulder passive ROM was 170 degrees in flexion, 165 degrees in abduction, and 70 degrees in external and internal rotation. *Id.* at 172-73.

Petitioner returned to Dr. Collins on July 31, 2019, reporting no change in her pain. Ex. 8 at 23, 25. They discussed treatment options, and Petitioner elected to proceed with surgery. *Id.* at 23, 26.

On August 29, 2019, Dr. Collins performed right shoulder arthroscopic debridement, subacromial decompression, rotator cuff repair, and biceps tenodesis on Petitioner. Ex. 3 at 17-19; Ex. 8 at 30-32. Petitioner saw Dr. Collins for a post-operative visit on September 11, 2019. Ex. 8 at 17. She was healing well, with no signs of infection. *Id.* at 19. She was instructed to continue exercises and start PT in two weeks. *Id.*

Petitioner underwent a post-operative PT evaluation on September 25, 2019. Ex. 8 at 167. She reported pain, weakness, and stiffness, and rated her pain seven out of ten. *Id.* On examination, her passive ROM was 80 degrees in flexion and 50 degrees in abduction. *Id.* at 168.

Petitioner followed up with Dr. Collins on October 9 and November 13, 2019. Ex. 8 at 12-16. She was progressing well, and he instructed her to continue PT. *Id.* On February 11, 2020, Petitioner saw Dr. Collins. Ex. 8 at 10. She was instructed to continue PT at her own pace. *Id.* at 12.

On May 13, 2020, Petitioner returned to Dr. Collins. Ex. 8 at 7. Her shoulder was "doing okay," but she was now experiencing neck pain and headaches. *Id.* at 9. She reported that reaching out increased her shoulder pain, and inquired about treatment options. *Id.* On examination, she had "normal" active ROM, with positive results on the Hawkins's and Neer's impingement tests. *Id.* Dr. Collins ordered a repeat MRI. *Id.*

Petitioner attended 49 PT sessions between September 25, 2019 and May 14, 2020. Ex. 8 at 45. At her last session on May 14th, she reported pain of three out of ten that worsened to five out of ten without medication. *Id*. Her shoulder ROM was now "functional," though her strength remained diminished and she continued to have pain with lifting and reaching overhead. *Id*. at 46.

Petitioner returned to Dr. Collins to review the MRI on June 2, 2020. Ex. 8 at 5. The MRI showed full healing of her rotator cuff tear, although her supraspinatus tendon showing a small area of tendinosis. *Id*. at 7. He advised her to stop PT and continue home exercises. *Id*. He also recommended a TENS[3] unit.

Petitioner received no further care bearing on this claim until two years later - on July 27, 2022, when she saw Dr. Vanessa Rose to establish primary care. Ex. 16 at 15. Petitioner reported that she could not lift more than three pounds with her right hand and wanted to be re-evaluated. *Id*. A right shoulder MRI was ordered. *Id*. The MRI showed postsurgical changes without a discrete focal full-thickness rotator cuff tear and mild degenerative acromioclavicular joint hypertrophy. *Id*. at 5-7.

Three months later (October 22, 2022), Petitioner saw orthopedist Dr. John Wilson for right shoulder pain. Ex. 16 at 10. She explained that since she received the tetanus vaccine, her shoulder "has not been the same." *Id*. She had areas of vague and diffuse tenderness and weakness. *Id*. On examination, her right shoulder exhibited full ROM, with some diffuse pain with motion. *Id*. Her shoulder strength was good, but she experienced episodes of weakness that did not "fit with" her clinical examination findings. *Id*. The MRI showed that her previous rotator cuff repair was intact. *Id*. Dr. Wilson did not think surgical intervention or imaging would be helpful, and recommended that Petitioner continue home exercises. *Id*. at 10-11.

The following month (November 29, 2022), Petitioner saw physician assistant ("PA") Caren Martagon for shoulder pain.[4] Ex. 21 at 404. Her daily pain was four out of ten, and she managed the pain with monthly deep tissue massages and not using the arm. *Id*. On examination, she had full ROM, although she reported pain with internal rotation. *Id*. at 405. PA Martagon prescribed a TENS unit and referred Petitioner to sports medicine. *Id*. at 404.

---

[3] TENS is an abbreviation for transcutaneous electrical nerve stimulation, which involves electrical stimulation of nerves that interferes with transmission of pain signals. *TENS* and *transcutaneous electrical nerve stimulation*, DORLAND'S ONLINE, https://www.dorlandsonline.com/dorland/definition?id=108464 (last visited Sept. 23, 2025).

[4] The record of this visit refers both to right and left shoulder pain. From a review of the record, I find that the references to left shoulder pain are likely typographical errors, and were meant to refer to Petitioner's right shoulder.

### B. Testimonial Evidence

Petitioner has filed a witness statement[5] and three affidavits. Exs. 2, 18, 19, 20. Petitioner states that the March 11, 2019[6] Tdap vaccine was administered by a nurse standing to her right. Ex. 18 at ¶ 2. She recalls the vaccination because the nurse seemed unprepared. *Id.* After administering the vaccine, the nurse walked away while blood ran down Petitioner's arm from the injection. *Id.* Petitioner had to request a bandage for the injection site. *Id.* This occurred on Petitioner's first day returning to work after 12 years staying at home with four children, so after vaccination she went to work. *Id.* That night, she looked at the bandage and thought it was odd that it was so high on her shoulder. *Id.*

The next day, when Petitioner got dressed her right shoulder was "very painful," and she did not have the strength to pull her pants up with her right arm. Ex. 18 at ¶ 3. That night, she and her husband, who both previously served as medics in the Air Force, discussed how high the bandage (covering the vaccination situs) was and that the vaccine should have been administered lower. *Id.* She took a picture of her arm when she took the bandage off. *Id.*

Over the following week, Petitioner became very concerned because she could not use her right arm for daily activities. Ex. 18 at ¶ 4. She decided to seek medical treatment. *Id.*

She received a steroid injection, which reduced the pain for a few days before it returned. Ex. 18 at ¶ 5. After surgery, she was in "intense uncontrollable pain for the first 24 hours." *Id.* at ¶ 8. She tried to return to work after three weeks, but was in too much pain and had to go home. *Id.* She then worked half days until she could tolerate full days. *Id.* PT was "up and down," with progress followed by plateaus due to inflammation and pain. *Id.* at ¶ 9. By the time she stopped PT, she was able to fasten her bra, put her hair in a ponytail, and lift up to three pounds. *Id.*

Petitioner states that when she returned to care in 2022, the orthopedist said there was nothing he could do, and had no explanation for why she was still in pain and unable to lift objects over three pounds. Ex. 18 at ¶ 13. Thereafter, her primary care provider prescribed a stronger TENS unit, which has provided the level of pain relief she previously received from deep tissue massages. *Id.* at ¶ 14. As of January 2023 (when she signed her affidavit), she continued to use the TENS unit two to three times a day. *Id.*

---

[5] Exhibit 2 is labeled a declaration, but was not sworn under penalty of perjury.

[6] Petitioner's affidavit incorrectly refers to her vaccination and some of her subsequent medical treatment as having occurred in 2018 and 2019 rather than 2019 and 2020. Ex. 18 at ¶¶ 2, 6, 9, 10. Due to these inaccuracies, it is difficult to ascertain whether other dates listed in her affidavit (which cannot be correlated to medical records) are accurate. *Id.* at ¶¶ 11, 12.

Dexter Robinson, Petitioner's spouse, filed an affidavit on her behalf. Ex. 19. He states that the day after vaccination, Petitioner began to experience pain in her shoulder. *Id.* at ¶ 5. He noticed that the wound from the needle was one to two inches higher than where it should have been for an intramuscular injection. *Id.* A week later, her shoulder pain was worse, so he made a physician appointment for her. *Id.* at ¶ 6.

Mr. Robinson states that before Petitioner underwent surgery, she was in constant pain and could barely lift three pounds. Ex. 19 at ¶ 8. After surgery, Petitioner did months of PT "to no avail," remaining in pain. *Id.* at ¶ 10.

Ayja Robinson, Petitioner's daughter and a registered nurse, submitted an affidavit on her behalf. Ex. 20. Before her injury, Petitioner could lift a case of water bottles and packages that came in the mail. *Id.* at ¶ 2. She had no difficulty with routine activities such as drying her hair, vacuuming, putting away dishes, or taking food out of the oven. *Id.* at ¶ 3. However, since her shoulder injury, she cannot perform these activities on her own. *Id.*


## II.     Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V,

1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[7] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a).

---

[7] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time-frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

Petitioner acknowledges that the vaccination record states that the vaccine was

administered in her left deltoid. Petitioner's Motion for Ruling on the Record, filed June 3, 2024, at *10 (ECF No. 46) ("Mot."). Nevertheless, Petitioner asserts that preponderant evidence indicates that the vaccine was actually administered in her right arm. *Id*. Petitioner relies on photographs of her arm (Exhibit 17) plus medical records relating right shoulder pain to her March 11, 2019 vaccination. *Id*. at *10-11.

Petitioner consistently attributed her right shoulder pain to the vaccine she reported receiving in her right arm. Mot. at *11. She provided these histories soon after vaccination. *Id*. And this information was provided to facilitate diagnosis and treatment, entitling the relevant records to greater weight. *Id*. (citing *Cucuras*, 993 F.2d at 1528).

Respondent argues that Petitioner is not entitled to compensation because she asserts a claim for a right arm injury, but the vaccination record "unequivocally indicates" that the vaccine alleged as causal was administered in her left deltoid. Respondent's Response, filed July 31, 2024, at *8 (ECF No. 47) ("Resp."). Respondent acknowledges that Petitioner has filed an affidavit and photographs "allegedly showing the site of vaccination in her right arm" – but notes that she did not do so until after Respondent first raised the issue of the situs of vaccine administration. *Id*. at *9.

Respondent also asserts that Petitioner has not preponderantly demonstrated that the notation that the vaccine was administered in Petitioner's left deltoid is likely an error. Resp. at *9. The photographs filed as Exhibit 17 "are not dated and simply appear to show an area of discoloration on her right arm." *Id*. at *10. Finally, although later medical records relate Petitioner's vaccination to her development of right shoulder pain, these records "appear to be based solely on the histories provided by petitioner" and thus are "based on petitioner's assertion alone," in Respondent's view. *Id*. Respondent does not contest that Petitioner has satisfied the requirements for a Table SIRVA or statutory requirements for compensation.

## C. Factual Findings on Situs of Vaccine Administration

I find that the record supports a finding that, more likely than not, Petitioner's Tdap vaccine was administered in her right arm. Although the vaccination record documents that it was administered in Petitioner's left deltoid, all other evidence suggests that the vaccine was administered in her right arm.

When seeking care for her right shoulder pain, Petitioner consistently related her pain to vaccination, reporting that her right shoulder had been painful since vaccination. That she sought care promptly after vaccination – just 14 days later – bolsters the reliability of these records. Testimonial evidence provides further support. And there is no evidence other than the vaccination record suggesting that the vaccine was administered in her left arm.

### D. Factual Findings on SIRVA QAI Criteria and Statutory Requirements

The QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Exs. 5, 18. She experienced pain within 48 hours of vaccination. Ex. 5 at 68. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 8 at 172-73. She received a covered vaccine in the United States. Ex. 1 at 3. She experienced residual effects of her injury for more than six months. Ex. 8 at 167. And she states that she never received an award or settlement for her vaccine-related injury, nor has she filed a civil action. Ex. 2 at ¶ 6.

I find that Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III.    Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[8]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $145,000.00. Mot. at *15. She relies on *Stromer*, *Wilson*, and *Stein*, involving awards of $145,000.00, $130,000.00, and

---

[8] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

$130,000.00, respectively.[9] *Id.* at *16-18. Petitioner describes her injury as "moderately severe," requiring surgical intervention. *Id.* Her pain level was high enough that she sought treatment just two weeks after vaccination, and her pain was seven out of ten at worst. *Id.* She saw four different doctors, underwent surgery and MRIs, participated in PT, and used an at-home TENS unit. *Id.* She had a difficult recovery, and surgery did not fully resolve her injury. *Id.*

Respondent proposes an award of less than $95,000.00. Resp. at *18-19. Respondent characterizes Petitioner's injury as moderate, and notes that there have been two SIRVA cases involving surgery featuring awards less than $100,000.00: *Hunt* and *Shelton*, with awards of $95,000.00 and $97,500.00, respectively.[10] *Id.* Respondent emphasizes that by July 2019 (four months after vaccination), Petitioner's shoulder pain was mild, two out of ten and five out of ten at worst. *Id.* at *15.

Within three months after surgery, Petitioner was "progressing well." Resp. at *15. Three months after that, she had "appropriate" ROM. *Id.* And in May 2020, she was discharged from PT after 49 sessions. *Id.* Although Petitioner asserts that she had a difficult recovery and that her surgery did not resolve her injury, Respondent views the medical records as demonstrating that Petitioner's pain had largely resolved by May 2020. *Id.* at *16. An MRI showed that her rotator cuff was fully healed, and she was discharged from PT with functional ROM.

Respondent emphasizes that, after her May 2020 PT discharge, Petitioner did not seek treatment for, or report, any shoulder problems for over two years, despite two intervening emergency department visits for unrelated problems. Resp. at *16. Her return to care occurred after this case had been pending for a year and a half. *Id.* And when she returned for care, her orthopedist found she had full ROM and good strength, and did not recommend any further treatment or advanced imaging (other than an MRI). *Id.* Respondent asserts that this lengthy gap "breaks the causal chain," meaning that Petitioner has demonstrated "at most fourteen months of treatment." *Id.*

Respondent asserts that Petitioner's case differs from the decisions she relies on. Resp. at *17-18. The *Stromer* petitioner experienced significant pain for a longer time

---

[9] *Stromer v. Sec'y of Health & Human Servs*., No. 19-1969V, 2022 WL 1562110 (Fed. Cl. Spec. Mstr. April 8, 2022-); *Wilson v. Sec'y of Health & Human Servs*., No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021); and *Stein v. Sec'y of Health & Human Servs*., No. 20-171V, 2023 WL 6367719 (Fed. Cl. Spec. Mstr. Aug. 25, 2023).

Petitioner cites factual details about *Stein* that were not included in the public decision in that case. As such, I do not address that case in any detail.

[10] *Hunt v. Sec'y of Health & Human Servs*., No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022); *Shelton v. Sec'y of Health & Human Servs*., No. 19-0279V, 2021 WLO 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

period than Ms. Robinson. *Id*. That petitioner rated her pain ten out of ten, and reported she was "miserable" and was unable to participate in PT due to pain. *Id*. The *Stromer* petitioner complained of significant pain during post-surgical PT, and had ongoing pain and significantly reduced ROM for 16 months. *Id*. Respondent contrasts this with Ms. Robinson's injury, where she initially rated her pain between five and seven, but her pain "resolved by forty percent within the first month." *Id*.

Respondent also asserts that *Wilson* and *Stein* are not comparable because "unlike this case, respondent had conceded that petitioner was entitled to compensation." Resp. at *17. And the *Stein* petitioner's course of treatment spanned three and a half years, much longer than Ms. Robinson's. *Id*.

Respondent asserts that *Hunt* and *Shelton* are better comparisons. Resp. at *18-19. The *Hunt* petitioner suffered a mild to moderate SIRVA for approximately 15 months, with periods of little to no pain. *Id*. The *Hunt* petitioner's pain was initially eight out of ten. That petitioner underwent two cortisone injections, PT, and surgery, and continued to report pain over 17 months after surgery, resulting in additional cortisone injections. *Id*. In Respondent's view, Ms. Robinson should receive a lower award than the *Hunt* petitioner because her initial pain was lower and her injury duration was shorter, with a better recovery after surgery. *Id*.

### C. Appropriate Compensation for Pain and Suffering

I find that the record supports a finding that Petitioner's injury most likely continued for approximately 15 months. Overall, Petitioner had a mild to moderate SIRVA. For the first month she had moderate and "unremitting" pain, but after two rounds of steroids her pain was mild. She describes intense pain following surgery, but after several months of PT she was able to stop treatment. She underwent surgery, one cortisone injection and attended approximately 50 PT sessions.

Petitioner continued treating until June 2020, when her orthopedist stated that her MRI showed full healing of her rotator cuff, with a small area of tendinosis. Ex. 8 at 5. He recommended that she stop PT and continue home exercises, along with a TENS unit. *Id*. Petitioner did not seek additional treatment or evaluation thereafter for over two years, supporting the conclusion that her injury abated soon after her June 2020 appointment.

I acknowledge that Petitioner again sought treatment for her right shoulder in 2022. But this occurred after a lengthy, two-year, gap (and also after the filing of this action). At this point, her MRI showed no pathology, and no treatment was recommended. As such, the evidence is not compelling enough to find that the pain she reported at that time was more likely than not related to her vaccine-related injury from years earlier.

Although *Hunt* is over-referenced in the Program by Respondent (usually in the goal of advocating for lower pain and suffering awards), it is in this case the closest comparable. Ms. Robinson and the *Hunt* petitioner both sought care approximately two

weeks after vaccination, and treated for over a year. Both underwent surgery, cortisone injections, and PT. But Ms. Robinson's pain was persistent, while the *Hunt* petitioner had periods of little to no pain. Ms. Robinson received fewer cortisone injections, but attended much more PT over a longer period of time.

*Stromer* is not a good comparable. The petitioner in that case consistently reported much higher pain ratings over a longer time span. And the *Wilson* and *Stein* petitioners' injuries persisted for significantly longer than Ms. Robinson's. In light of the record evidence, I find that an award of **$105,000.00** for pain and suffering is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that Petitioner's March 11, 2019 Tdap vaccine was administered in her right arm, GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $105,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[11]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $105,000.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.